EFILED
Clerk Billie Maggard
8/4/2025 2:57 PM
Superior Court Yakima County, WA

**YAKIMA COUNTY SUPERIOR COURT**
**IN AND FOR THE STATE OF WASHINGTON**

EVARISTO SALAS III,

                Plaintiff,

   v.

JAMES RIVARD in his official and individual capacity; CITY OF SUNNYSIDE, a municipal corporation; SUNNYSIDE POLICE DEPARTMENT, an agency of the CITY OF SUNNYSIDE; and JOHN/JANE DOES 1-10 in their official and individual capacities,

                Defendants.

NO. 25-2-02369-39

COMPLAINT

Plaintiff EVARISTO SALAS III, by and through his attorneys of record, Laura Shaver, Rico Tessandore, and Todd Maybrown, submits this Complaint and alleges upon personal knowledge as to himself and his actions, and upon information and belief as to all other matters, as follows:

## I.    <u>INTRODUCTION</u>

1.1.    Evaristo "Junior" Salas III was only fifteen years old when he was wrongly accused — stripped of his youth, freedom, and future — by a police department that prioritized conviction over truth. This lawsuit seeks to hold accountable those responsible for one of the most egregious miscarriages of justice in Washington state history.

1.2.    On November 14, 1995, in Sunnyside, Washington, Jose Arreola was shot twice in the head while sitting in a Mazda pickup truck. Mr. Arreola's girlfriend, Ofelia Gonzalez,

COMPLAINT FOR DAMAGES

Page 1 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

stood nearby holding their infant son.

1.3.    The Arreloa homicide was investigated by defendant Sunnyside Police Department ("SPD") and its officers and agents; the lead investigator for the Arreola homicide was SPD Detective Sergeant James Rivard.  This was the very first homicide case in which Det. Sgt. Rivard served as the lead detective.

1.4.    Mr. Salas, a child with no connection to the shooting, was arrested months later and charged as an adult based solely on coerced and fabricated evidence.  Mr. Salas served more than 27 years in prison for a crime he did not commit — the longest known wrongful incarceration in Washington State history.

1.5.    There was no physical evidence linking Mr. Salas to the homicide, and several independent eyewitnesses described an assailant who looked nothing like him.  Ms. Gonzalez — who initially failed to identify any suspect and was herself suspected of concealing and/or destroying evidence relating to the homicide — was shown over a dozen photo montages, a police book of mug shots, and even a school yearbook in an effort to generate a suspect. Sometime later, according to Det. Sgt. Rivard, Ms. Gonzalez "identified" Mr. Salas as the assailant.  Ms. Gonzalez's supposed identification of Mr. Salas was false, as Mr. Salas had no involvement in the Arreola homicide.  Det. Sgt. Rivard knew or should have known that Ms. Gonzalez's supposed identification of Mr. Salas was false.

1.6.    After months of failing to find a suspect or develop a motive, Det. Sgt. Rivard was under pressure to solve his first homicide case. Desperate, Det. Sgt. Rivard turned to WB, a professional, paid informant who was working off felony burglary charges in Benton County, Washington.

1.7.    In May 1996, while Mr. Salas was at the SPD headquarters for an unrelated matter, Det. Sgt. Rivard spontaneously and without investigative justification took three Polaroid photographs of Mr. Salas.  At the time, Mr. Salas was not a suspect in the Arreola homicide as there was no evidence to link him to that crime.  Det. Sgt. Rivard then returned to his office, where WB was coincidentally present.  According to Det. Sgt. Rivard, he placed the Polaroid

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

1    photographs on his desk and WB immediately and unprompted claimed he had previously

2    overheard Mr. Salas confess to the Arreola homicide.  This supposed spontaneous identification

3    became the cornerstone of the prosecution's case against Mr. Salas.

4        1.8.    But WB's purported identification of Mr. Salas was a lie, and Det. Sgt. Rivard

5    knew or should have known that WB's claims were false.  In the years following Mr. Salas'

6    conviction, WB recanted his identification and Mr. Salas' claimed confession.  WB now admits

7    that Mr. Salas never confessed to him, that he never saw the Polaroids on Det. Sgt. Rivard's desk,

8    and that the entire account of a spontaneous identification was fabricated. The story — that WB

9    just happened to be in the office, happened to recognize Mr. Salas, and happened to recall a

10    confession — was a false narrative created by Det. Sgt. Rivard and SPD to cover up the coercion

11    and deal-making that actually took place.  SPD never investigated the veracity of WB's account.

12    Instead, SPD manufactured – and fabricated – a prosecution around it.

13        1.9.    Det. Sgt. Rivard made off-the-book cash payments to WB and used extraordinary

14    measures to ensure WB's Benton County felony charge was reduced to a misdemeanor in

15    exchange for his assistance with numerous cases, including SPD's investigation of the Arreola

16    homicide. But these cash payments and plea arrangement were never disclosed to Mr. Salas or

17    his defense counsel.  At trial, WB falsely testified that he received no benefit for his testimony.

18    Det. Sgt. Rivard affirmed that lie.  Consequently, the jury never heard the truth.

19        1.10.    Central to SPD's misconduct was the use of an unregulated cash-based "slush

20    fund" to pay informants.  This practice lacked basic documentation safeguards, with payments

21    made in cash, and without any records tying payments to specific cases.  SPD, including SPD

22    Chief Wallace Anderson, knew of and condoned the practice.  Det. Sgt. Rivard used this slush

23    fund to pay WB for manufactured evidence against Mr. Salas.  The slush fund concealed police

24    conduct and undermined constitutional accountability.

25        1.11.    SPD's informant payment practices were not only concealed, but systemically

26    abused.  SPD's officers used cash incentives to elicit false information, to secure plea deals, and

27    to bolster weak investigations. The existence and misuse of this fund was known to SPD including

28

COMPLAINT FOR DAMAGES

Page 3 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

Chief Anderson, and reflects a wholesale failure in training, supervision, and constitutional compliance.

1.12.     Just four days after the shooting of Mr. Arreola, Ms. Gonzalez unlawfully retrieved the crime scene, the Mazda pickup truck, from impound and had it cleaned and repaired, thus destroying critical forensic evidence. When questioned about her conduct, Ms. Gonzalez gave multiple, conflicting accounts, initially refused a polygraph, and was suspected of rendering criminal assistance.  Det. Sgt. Rivard even listed Ms. Gonzalez as an "offender" in an official police report.  The referral of potential criminal charges to the Yakima County Prosecutor's Office of Ms. Gonzalez, for unknown reasons, did not follow what would be considered standard protocol and this report (and related information) was never provided to defense counsel.

1.13.     Mr. Salas was convicted based on the tainted testimony of WB and Ms. Gonzalez, and the inferences derived from the claimed investigation by SPD and Det. Sgt. Rivard.  No physical evidence linked Mr. Salas to the homicide.  The State's case was built on fabrication, coercion, concealment, and systemic disregard for constitutional safeguards.

1.14.     For decades, Mr. Salas fought to prove his innocence. In August 2023, Det. Sgt. Rivard finally admitted — under oath — that he had, in fact, paid WB for his role in the case, a fact Det. Sgt. Rivard had denied since 1996.  The Yakima County Prosecuting Attorney then moved to vacate the conviction, and Mr. Salas was exonerated and released that same day.

1.15.     The damage, however, was irreversible.  Mr. Salas, who entered prison as a child, was subjected to near-constant trauma: including assaults, prolonged solitary confinement, repeated suicide attempts, untreated mental health crises, and the permanent loss of his formative years.  Mr. Salas' development, health, family, and dignity were stolen by Defendants.

1.16.     From the outset, Defendants had both the power and the duty to disclose the truth. Instead, they buried exculpatory evidence, fabricated a case, and perpetuated Mr. Salas' wrongful conviction year after year.  These constitutional violations inflicted cumulative and compounding injuries from 1996 through 2023 — and Mr. Salas will suffer their effects for the rest of his life.

///

COMPLAINT FOR DAMAGES

Page 4 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

## II.    PARTIES

2.1.    Plaintiff EVARISTO SALAS III is a resident and citizen of the City of Sunnyside, Yakima County, Washington.

2.2.    Defendant CITY OF SUNNYSIDE is a municipal corporation organized under the laws of the State of Washington with over 16,000 residents. Sunnyside operates the Sunnyside Police Department.  Sunnyside police officers are Sunnyside employees.

2.3.    Defendant SUNNYSIDE POLICE DEPARTMENT is an agency of the CITY OF SUNNYSIDE. As referenced herein, officers of the Sunnyside Police Department ("SPD"), acting as agents of the City, investigated Plaintiff for the crime of the murder of Jose Arreola.

2.4.    Defendant JAMES RIVARD is a former detective sergeant and law enforcement officer who, at times relevant to this Complaint, worked for the City of Sunnyside and/or SPD. Defendant Det. Sgt. Rivard was acting as a state official, and within the course and scope of his employment at all relevant times herein.  Defendant Det. Sgt. Rivard is sued in his official and individual capacities.

2.5.    Plaintiff is currently unaware of the true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, and therefore sues these Defendants by fictitious names. Plaintiff is informed and believes, and thereon alleges, that each of these DOE Defendants is responsible in some manner for the occurrences alleged in this Complaint, and that Plaintiff's injuries were proximately caused by their conduct. Plaintiff will seek leave to amend this Complaint to allege their true names and capacities when they are ascertained. Each DOE Defendant is sued in both their individual and official capacities to the extent permitted by law.

## III.    JURISDICTION AND VENUE

3.1    Defendants reside and are located in Yakima County, Washington, and the arrest, prosecution, and conviction of Mr. Salas took place in Yakima County, Washington. Accordingly, venue in this action lies within Yakima County, Washington, pursuant to RCW 4.12.020 and 4.12.025.  The Court has jurisdiction over Defendants pursuant to RCW 4.28.185. The Court has subject matter jurisdiction to hear this matter.

COMPLAINT FOR DAMAGES

Page 5 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

3.2    Plaintiff filed a Standard Tort Claim Form with City of Sunnyside in March 2024, in compliance with RCW 4.92.100.  Over sixty days have elapsed, and Plaintiff has complied with all requisite filing, notice, and other procedural requirements.

## IV.    FACTS

### A.  The Arreola Homicide

4.1    On November 14, 1995, at approximately 6:00 p.m., Jose Arreola, his fiancée Ofelia Gonzalez, and their infant son arrived at their apartment complex in Ms. Gonzalez's Mazda pickup truck. Ms. Gonzalez then exited the with the baby, leaving Mr. Arreola alone in the truck. Two gunshots were then fired through the closed passenger-side window, striking Mr. Arreola in the head.  Because of dark tinting material applied to the glass, the truck's window remained intact showing the exact entry points for each of the bullet holes.  Ms. Gonzalez ran to a neighbor's apartment and asked them to call the police.

### B.  The SPD Investigation

4.2    SPD officers arrived soon after the shooting. Ms. Gonzalez would claim to have seen two young people approaching the passenger side of the truck as she exited the drivers' side. Ms. Gonzalez described one of these people as between 15 and 16 years old, with slicked back hair, and the other as between 7 and 8 years old.

4.3    The Mazda pickup truck, a critical piece of evidence, was towed to a privately managed lot that contracted with the City.  The lot was given written notice that the truck was to be treated as a crime scene and instructed not to release it so it could be processed for evidence.

4.4    Det. Sgt. Rivard was assigned as the lead investigator on the Arreola homicide. Though commissioned since 1976, this was Det. Sgt. Rivard's first homicide case as primary investigator.

4.5    SPD officers began canvassing the area immediately after the shooting. Three neighborhood children — RP, MC, and AP — were interviewed by SPD Officers.  RP and AP described the shooter as a white male in his 30s, with a mustache and a Chicago Bulls baseball cap.  RP reported hearing a female yell, "Ricardo, leave him alone," followed by gunshots.  MC

believed several people were arguing before shots were fired.  All three witnesses described up to four suspects and a brown getaway vehicle.  A neighbor, BM, heard an argument and then gunshots. He reported seeing a short Mexican man in his 30s running from the scene to a waiting black or brown Buick Skylark, a car he had seen before at the complex. These independent witnesses' accounts were in direct conflict with Ms. Gonzalez's description of the event and assailants.

4.6     On November 17, 1995, SPD officers interviewed Ms. Gonzalez at the SPD headquarters. She reviewed photo montages but was unable to identify any suspects.

4.7     Over the course of the investigation, SPD's officers subjected Ms. Gonzalez to at least twelve sets of photo montages.  When those efforts failed to yield results, Det. Sgt. Rivard took the extraordinary step of providing Ms. Gonzalez with a book of mug shots and a school yearbook to search through without offering any direction or guidance.  It remains undocumented whether Mr. Salas' photograph was included among these materials.

### C.  The Crime Scene Goes Missing

4.8     On or about November 18, 1995, four days after the shooting, Ms. Gonzalez went to the impound lot and falsely claimed she had SPD's permission to retrieve the Mazda pickup truck.

4.9     On or about November 21, 1995, Det. Sgt. Rivard discovered the truck had been released to Ms. Gonzalez.  Det. Sgt. Rivard quickly confirmed that no one at SPD had authorized release of the truck.

4.10     On or about November 27, 1995, Det. Sgt. Rivard interviewed Ms. Gonzalez, who gave multiple, conflicting explanations about how she obtained the truck, none of which could be verified.  Ms. Gonzalez denied telling the owner of the impound lot that SPD had authorized the release, contradicting the representations of the owner of the lot.  An SPD detective who was present for the interview, Det. Evans, noted that Ms. Gonzalez appeared evasive and untruthful.

4.11     Det. Sgt. Rivard subsequently completed an Incident Report listing Ms. Gonzalez as the "offender" for Rendering Criminal Assistance (Homicide), a Class A felony.  However,

COMPLAINT FOR DAMAGES

Page 7 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

despite his professional duty to do so, it is unknown whether a referral was made to the Yakima County Prosecuting Attorney.  However, what is known is that these facts were never disclosed to Mr. Salas or his defense counsel.  This failure — whether the result of gross negligence or a deliberate effort to conceal exculpatory and impeachment evidence — was critical. Had the information been properly disclosed, Ms. Gonzalez's credibility would have been meaningfully challenged, and the jury would have learned she was under suspicion for interfering with SPD's investigation from the outset.  Instead, Det. Sgt. Rivard allowed Ms. Gonzalez to testify as a neutral and cooperative eyewitness.

4.12    Det. Evans did not testify at trial about this interview or Ms. Gonzalez's status as a suspect in the related felony investigation.

4.13    On November 30, 1995, a different SPD detective asked Ms. Gonzalez to take a polygraph regarding the truck, but she refused.  This SPD detective noted that Ms. Gonzalez was uncooperative throughout the investigation.

### D.  Det. Sgt. Rivard Turns to a Professional Informant

4.14    By January 1996, the Arreola homicide investigation remained stalled. No suspect had been identified, and no new evidence had surfaced.

4.15    Under pressure to close his first homicide case, Det. Sgt. Rivard contacted WB, a professional informant he previously used in drug and theft investigations.

4.16    WB first began working with SPD in August 1995 to avoid criminal charges.  Det. Sgt. Rivard considered WB a "star" informant even though Det. Sgt. Rivard was aware that WB often engaged in criminal conduct at the same time he was working as an agent of SPD.  Det. Sgt. Rivard continued to elicit the assistance of WB on criminal investigations even though Det. Sgt. Rivard was aware that another SPD detective believed WB was unreliable and untrustworthy.

4.17    In early 1996, SPD intervened in a criminal case in Benton County, Washington, wherein WB was facing a charge of residential burglary (a Class B felony and crime of moral turpitude).

4.18    On February 21, 1996, Det. Sgt. Rivard faxed a letter to the Benton County Sheriff

COMPLAINT FOR DAMAGES

Page 8 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

asserting that WB's prosecution was a "misunderstanding" and that he should be afforded leniency.

4.19    On April 8, 1996, Det. Sgt. Rivard sent a follow-up memo to the Benton County Prosecuting Attorney asking for leniency based on WB's cooperation with SPD.

4.20    On May 22, 1996, WB was charged with a misdemeanor offense, rather than residential burglary, as a result of Det. Sgt. Rivard's conduct.  WB later pled guilty to the reduced charge and received a suspended sentence and fine.

4.21    Despite having committed a serious offense and crime of moral turpitude in Benton County, Det. Sgt. Rivard later boasted that WB was his "co-favorite" informant and a man of good moral character.

4.22    Det. Sgt. Rivard controlled an unregulated "green bag" of cash used to pay informants without documentation linking payments to particular cases.  SPD often identified informants by use of an assigned number or alias to hide their true identity.

4.23    Consistent with this custom and practice, SPD made numerous undisclosed cash payments to WB and other informants.

4.24    During March 1996, Det. Sgt. Rivard directed WB to visit Rainier Court in Sunnyside, Washington — a known hangout for young Hispanic men — to gather information about potential criminal activity.  WB later claimed he overheard two individuals discussing the Arreola homicide but that he could not identify them.

4.25    On May 6, 1996, Mr. Salas was present at the SPD precinct regarding an unrelated matter.  Det. Sgt. Rivard entered the interview room and took three Polaroid photographs of Mr. Salas without any investigative purpose.  Det. Sgt. Rivard subsequently used these Polaroid photographs to obtain false identifications of Mr. Salas as a participant in the Arreola homicide.

4.26    Det. Sgt. Rivard claimed that after taking the Polaroid photographs of Mr. Salas, he returned to his office where his professional informant, WB, was coincidentally waiting. Then, according to Det. Sgt. Rivard, upon seeing the Polaroid photographs, WB allegedly identified Mr. Salas as the person who had confessed to the Arreola homicide.

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

1     4.27    This story — a supposed spontaneous identification — became the foundation of

2    the prosecution's case against Mr. Salas.  But WB has since recanted, and he now admits that

3    Mr. Salas never confessed to him and that the story about his viewing of the Polaroid

4    photographs was fabricated.  In reality, the entire sequence of events described by Det. Sgt.

5    Rivard never happened.

6             **E.  Ofelia Gonzalez's Suggestive and Coerced Identification of Mr. Salas**

7     4.28    Throughout the investigation, SPD made repeated and increasingly irregular

8    efforts to generate a suspect identification from Ms. Gonzalez.  When initial photo montages

9    yielded no results, Det. Sgt. Rivard escalated his tactics.

10    4.29    Ms. Gonzalez was shown at least twelve different sets of photo montages

11   throughout the investigation. When Ms. Gonzalez still could not identify a suspect, Det. Sgt.

12   Rivard gave her a book of mug shots and even a local school yearbook to review — without any

13   record of how these photographs were selected or whether Mr. Salas' image was among them.

14   Det. Sgt. Rivard engaged in these tactics, and departed from standard identification procedures,

15   even though he was aware that such tactics increased the likelihood of a misidentification.

16    4.30    On May 13, 1996, Ms. Gonzalez was shown a photo montage that included a

17   photograph of Mr. Salas. She asked to see more pictures of Mr. Salas and Det. Sgt. Rivard

18   provided her with the Polaroid photographs he had taken on May 6, 1996. This unusual sequence

19   purportedly led Ms. Gonzalez to "identify" Mr. Salas as the person who murdered Mr. Arreola.

20   Det. Sgt. Rivard knew or should have known that Ms. Gonzalez's supposed identification was

21   tainted and highly unreliable.

22    4.31    Ms. Gonzalez's eventual identification of Mr. Salas was the product of a

23   suggestive, multi-stage process engineered by SPD.  It came only after repeated exposure to photo

24   montages, unconventional source materials, and months of investigative pressure. The procedures

25   employed by Det. Sgt. Rivard tainted the reliability of Ms. Gonzalez's supposed identification

26   and violated Mr. Salas' due process rights under clearly established law.

27   ///

28

COMPLAINT FOR DAMAGES

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

4.32     In addition to her role as a purported eyewitness, Ms. Gonzalez engaged in conduct that directly undermined her credibility — conduct known to SPD and not disclosed to Mr. Salas and his defense counsel.

### F.  SPD's Suppression of Exculpatory Evidence Relating to Ms. Gonzalez

4.33     On or about November 18, 1995, just four days after the murder, Ms. Gonzalez retrieved the Mazda pickup truck — the crime scene — from the impound lot by falsely claiming SPD had authorized its release.  Ms. Gonzalez then took steps to have the truck cleaned and repaired, effectively destroying critical forensic evidence.

4.34     When questioned by Det. Sgt. Rivard about how she obtained the vehicle, Ms. Gonzalez gave multiple, conflicting versions of events, including that her sister or parents were contacted, or that she received a letter or phone call from the tow company.  Ms. Gonzalez's parents later refused to answer questions about the matter.  Ms. Gonzalez also denied telling the owner of the impound lot that SPD had approved the release, despite testimony to the contrary from the owner.

4.35     An SPD officer who was present for an interview with Ms. Gonzalez concluded she was being untruthful and noted that she and her friends appeared to be "pumping" SPD officers for information regarding the Arreola homicide investigation.  The SPD officer reported that Ms. Gonzalez's question, "Do you have a gun?" was suspicious, as SPD had not disclosed to the public that no firearm had been recovered.

4.36     Det. Sgt. Rivard ultimately listed Ms. Gonzalez as the "offender" in an incident report and claims to have referred her for potential prosecution for Rendering Criminal Assistance in connection with the Arreola homicide.  It is unclear what happened with this supposed referral, although no charges were ever filed against Ms. Gonzalez.   Upon information and belief, Det. Sgt. Rivard never disclosed this referral to the prosecuting attorney assigned to Mr. Salas' case. Moreover, neither Mr. Salas nor his defense counsel were informed of Ms. Gonzalez's unlawful conduct or her status as a suspect.  As a result, the jury never heard critical evidence that would have called into question Ms. Gonzalez's testimony and the supposed identification of Mr. Salas.

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

Whether the failure to disclose the referral was intentional or the product of gross negligence, the result was the same: Mr. Salas was denied a fair trial.

4.37    Ms. Gonzalez later refused to take a polygraph exam and continued to be evasive and uncooperative with SPD. Nevertheless, she was presented to the jury as a cooperative and reliable eyewitness. Consistent with SPD's customs and practices, Mr. Salas and his counsel were never informed that Ms. Gonzalez had been considered the suspect of a felony offense, had interfered with the crime scene, or had lied to police. SPD's suppression of impeachment material constituted a violation of Mr. Salas' constitutional rights.

4.38    Upon information and belief, Det. Sgt. Rivard pressured Ms. Gonzalez to identify Mr. Salas only after he had fabricated a false confession narrative through informant WB. At the time Det. Sgt. Rivard sought Ms. Gonzalez's identification, she was aware that she was under investigation for Rendering Criminal Assistance — a Class A felony — in connection with her unlawful retrieval and destruction of the crime scene vehicle. Upon information and belief, Det. Sgt. Rivard exploited this leverage, using the threat of criminal referral or prosecution to extract a desired identification of Mr. Salas. The resulting identification — made only after Ms. Gonzalez had failed to identify any suspect in more than a dozen photo montages — was the product of coercion and manipulation, not independent recollection or reliability. This misconduct was never disclosed to Mr. Salas or his defense counsel and deprived Mr. Salas of critical impeachment material in violation of his constitutional rights.

## G. Decline Hearing and Trial

4.39    On May 22, 1996, Mr. Salas was arrested by SPD and charged with the homicide of Jose Arreola. At that time, Mr. Salas was a juvenile, just 15 years old.

4.40    In August 1996, a decline hearing was held to determine whether Mr. Salas would be prosecuted in adult court. The court granted the State's request, and Mr. Salas was tried as an adult. Mr. Salas' trial began on December 10, 1996 — just seven days before his sixteenth birthday.

///

4.41    The prosecution's case relied almost entirely on the testimony of two witnesses: WB and Ms. Gonzalez.  WB testified that Mr. Salas had confessed to him at Rainier Court.  Ms. Gonzalez testified she had identified Mr. Salas as the shooter after viewing the Polaroid photographs taken by Det. Sgt. Rivard.

4.42    WB testified under oath that he was not paid for his involvement in the Arreola investigation and had received no benefit for his cooperation with SPD.  Det. Sgt. Rivard, who acted as the State's managing witness per ER 615 and who orchestrated WB's cooperation, sat silent and did nothing to correct this false testimony.

4.43    In fact, Mr. Salas' defense counsel had specifically requested records of any payments made to WB before trial.  SPD never disclosed those records.  Nor did SPD disclose the fact that WB's Benton County felony charge had been reduced to a misdemeanor in exchange for his cooperation with Det. Sgt. Rivard.

4.44    This concealment deprived the defense of crucial impeachment evidence. The jury never heard that WB had received both cash payments and owed SPD for ensuring he was not incarcerated for his previous felonious activity in Benton County.   SPD did not have or failed to implement safeguards – or standard police practices and procedures – so that this information was reviewed, collected and distributed to others. SPD failed to adequately review Mr. Salas' investigation to ensure that all *Brady* disclosures were produced, identifications were not tainted, and that individuals were not coerced into testifying.

4.45    Likewise, the jury was never informed that Ms. Gonzalez had previously been investigated for Rendering Criminal Assistance, and had given multiple conflicting statements about retrieving and cleaning the crime scene vehicle shortly after the shooting.  SPD never disclosed this impeachment material, despite being in possession of official reports listing Ms. Gonzalez as a potential suspect.

4.46    Det. Sgt. Rivard also engaged in witness intimidation during trial. When defense witness Sylvia Siller — who planned to provide alibi testimony — took the stand, Det. Sgt. Rivard reminded Ms. Siller that he had previously investigated her for theft and had video evidence that

COMPLAINT FOR DAMAGES

Page 13 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

showed her stealing a hot dog from her employer. The trial judge admonished Det. Sgt. Rivard after learning of this misconduct.

4.47    After a five-day trial, the jury convicted Mr. Salas of murder based upon the false – and sanitized – testimony of WB and Ms. Gonzalez.

### H.  Post-Conviction Relief

4.48    Mr. Salas spent the next 27 years fighting to prove his innocence. He pursued multiple avenues for post-conviction relief, including a direct appeal in 1997, Personal Restraint Petitions in 2006 and 2010, and a CrR 7.8 motion in 2020 supported by a 2021 motion for discovery.  Throughout this time, SPD and Det. Sgt. Rivard continued to suppress the truth.

4.49    On August 16, 2023, during post-conviction proceedings, Det. Sgt. Rivard admitted for the first time that he had, in fact, paid WB for his role in the investigation of the Arreola homicide.  Det. Sgt. Rivard also acknowledged that he had long known about the favorable treatment WB received on his unrelated criminal case in Benton County.

4.50    The following day, the Yakima County Prosecuting Attorney moved to vacate Mr. Salas' conviction.  The charges were dismissed with prejudice, and Mr. Salas was immediately released from custody after spending more than 27 years in prison for a crime he did not commit.

### I.  The Damage Had Been Done

4.51    Mr. Salas endured unimaginable trauma and hardship throughout his wrongful incarceration. He was only fourteen years old when the crime occurred.  After being declined from juvenile jurisdiction, Mr. Salas faced an adult sentence of nearly four decades. At just five feet tall and weighing barely over 100 pounds, Mr. Salas was placed in an adult jail.

4.52    While incarcerated in Yakima County Jail awaiting trial, Mr. Salas became severely depressed and attempted suicide. Upon entering prison, Mr. Salas was an adolescent in an adult system — vulnerable to constant physical and sexual violence.

4.53    Mr. Salas was forced to join a prison gang to survive.  Despite these safety measures, Mr. Salas was regularly assaulted and suffered repeated psychological breakdowns. On or about June 17, 1999, and on or about September 13, 1999, Mr. Salas was physically

COMPLAINT FOR DAMAGES

Page 14 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

1  attacked.  He was subsequently placed in isolation.

2  4.54  On or about July 26, 2003, Mr. Salas attempted suicide by cutting his wrists.  He

3  told medical staff that he never intended to wake up and that he had no hope for his future.  Mr.

4  Salas remained in a state of extreme despair for years.

5  4.55  On or about July 26, 2008, Mr. Salas was violently attacked by another inmate and

6  suffered deep lacerations to his head, neck, and back.

7  4.56  On or about December 5, 2012, Mr. Salas learned that his biological father — who

8  had hoped to reconnect with him — had passed away.  The loss devastated him.

9  4.57  On or about June 30, 2013, Mr. Salas fractured his right hand while defending

10  himself during an altercation.  Fearing further targeting, Mr. Salas removed his splint and

11  bandages to hide his vulnerability and endured a painful recovery without protection.

12  4.58  Approximately nine-and-a-half years of Mr. Salas' imprisonment were spent in

13  solitary confinement.  The psychological effects of that prolonged isolation remain ongoing.

14  4.59  Mr. Salas continues to suffer from the compounded emotional, physical, and

15  psychological effects of a wrongful conviction that stole his youth, his future, and his dignity.

16  ## V.    FIRST CAUSE OF ACTION: 42 U.S.C. § 1983 — MALICIOUS PROSECUTION (INDIVIDUAL DEFENDANTS AND THE CITY OF SUNNYSIDE)

17

18  5.1  Plaintiff realleges and incorporates by reference all preceding paragraphs as if

19  fully set forth herein.

20  5.2  Defendants, acting under color of law, initiated, continued, and caused the criminal

21  prosecution of Plaintiff without probable cause and with knowledge that the allegations against

22  him were false.

23  5.3  Defendants' conduct was driven by malice and a reckless or intentional disregard

24  for the truth.  Their motives included concealing investigative misconduct, suppressing

25  exculpatory and impeachment evidence, and securing a conviction despite knowledge that

26  Plaintiff was innocent.

27  ///

28
COMPLAINT FOR DAMAGES

Page 15 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

5.4    The prosecution terminated in Plaintiff's favor when his conviction was vacated and all charges were dismissed with prejudice on August 17, 2023.

5.5    As a direct result of this malicious prosecution, Plaintiff was deprived of his rights under the Fourth and Fourteenth Amendments, including his right to be free from unreasonable seizure and his right to a fair trial and due process of law.

5.6    Defendants' actions were intentional, reckless, and undertaken with deliberate indifference to Plaintiff's constitutional rights. Their misconduct was the proximate cause of Plaintiff's wrongful conviction, 27 years of incarceration, and the severe emotional, psychological, and physical harm he endured.

5.7    Defendant City of Sunnyside is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because the constitutional violations described above were caused by official policies, longstanding customs, and/or the City's deliberate indifference in failing to train, supervise, and discipline its officers. These failures include, but are not limited to: inadequate training on disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963); toleration of the use of unreliable informants without accountability or documentation; systemic misuse of off-the-books cash payments to incentivize false testimony; failure to investigate and discipline officers who suppressed exculpatory evidence or fabricated facts; and the assignment of inadequately trained officers to lead homicide investigations. These policies and failures created an environment in which constitutional violations were not only foreseeable, but inevitable. The injuries suffered by Plaintiff were the direct and proximate result of the City's unconstitutional practices and deliberate indifference.

5.8    This claim is timely under applicable federal and state law.  For claims brought under 42 U.S.C. § 1983, accrual is governed by federal law, and pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), and *McDonough v. Smith*, 588 U.S. 109 (2019), claims that necessarily imply the invalidity of a conviction do not accrue until the conviction is invalidated.  Plaintiff's conviction was vacated and charges dismissed on August 17, 2023. Accordingly, the statute of limitations on all federal constitutional claims did not begin to run until that date.

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

5.9    The misconduct described herein was objectively unreasonable and undertaken with willfulness and reckless indifference to the rights of others for which an award of punitive damages is warranted.

## VI.    SECOND CAUSE OF ACTION: 42 U.S.C. § 1983 — FABRICATION OF EVIDENCE (INDIVIDUAL DEFENDANTS AND THE CITY OF SUNNYSIDE)

6.1.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

6.2.    Defendants, acting under color of law, deliberately fabricated evidence against Plaintiff in order to initiate and sustain a criminal prosecution. This fabricated evidence included, but was not limited to:

    a)    knowingly presenting false, coerced, or manipulated witness statements;

    b)    relying on a paid informant known to be unreliable and withholding the nature and extent of the inducements provided to him; and

    c)    suppressing material exculpatory and impeachment evidence that would have undermined the credibility of the prosecution's key witnesses and supported Plaintiff's innocence.

6.3.    Defendants knew or should have known the evidence they manufactured and presented was false, and that its use in a criminal prosecution would likely result in the wrongful conviction of an innocent person.

6.4.    The fabricated evidence was material to the prosecution's case, was presented to the jury at trial, and directly contributed to Plaintiff's conviction, thereby depriving him of liberty without due process of law, in violation of the Fourteenth Amendment.

6.5.    Defendants' actions were intentional, reckless, and undertaken with deliberate indifference to Plaintiff's constitutional rights. Their misconduct was the proximate cause of Plaintiff's wrongful conviction, 27 years of incarceration, and the severe emotional, psychological, and physical harm he endured.

///

COMPLAINT FOR DAMAGES

Page 17 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

6.6.     Defendant City of Sunnyside is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because the constitutional violations described above were caused by official policies, longstanding customs, and/or the City's deliberate indifference in failing to train, supervise, and discipline its officers. These failures include, but are not limited to: inadequate training on disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963); toleration of the use of unreliable informants without accountability or documentation; systemic misuse of off-the-books cash payments to incentivize false testimony; failure to investigate and discipline officers who suppressed exculpatory evidence or fabricated facts; and the assignment of inadequately trained officers to lead homicide investigations. These policies and failures created an environment in which constitutional violations were not only foreseeable, but inevitable. The injuries suffered by Plaintiff were the direct and proximate result of the City's unconstitutional practices and deliberate indifference.

6.7.     This claim is timely under applicable federal and state law. For claims brought under 42 U.S.C. § 1983, accrual is governed by federal law, and pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), and *McDonough v. Smith*, 588 U.S. 109 (2019), claims that necessarily imply the invalidity of a conviction do not accrue until the conviction is invalidated. Plaintiff's conviction was vacated and charges dismissed on August 17, 2023. Accordingly, the statute of limitations on all federal constitutional claims did not begin to run until that date.

6.8.     The misconduct described herein was objectively unreasonable and undertaken with willfulness and reckless indifference to the rights of others for which an award of punitive damages is warranted.

## VII.     THIRD CAUSE OF ACTION: 42 U.S.C. § 1983 — SUPPRESSION OF EXCULPATORY EVIDENCE (INDIVIDUAL DEFENDANTS AND THE CITY OF SUNNYSIDE)

7.1.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

7.2.     Defendants, acting under color of law, willfully or recklessly withheld material exculpatory and impeachment evidence from Plaintiff and/or the prosecuting attorney, in

COMPLAINT FOR DAMAGES

Page 18 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

violation of Plaintiff's clearly established rights under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959), and their progeny. The suppressed evidence included, but was not limited to:

   a) undisclosed payments and inducements provided to informants, including WB;

   b) prior inconsistent statements, falsehoods, and recantations by key witnesses;

   c) documentation of informant unreliability and criminal history; and

   d) evidence demonstrating that Ms. Gonzalez had been under active investigation for Rendering Criminal Assistance and had interfered with the crime scene.

7.3.    The suppressed evidence was favorable to the defense, material to the outcome of the trial, and would have undermined the credibility of the prosecution's central witnesses. Its concealment deprived Plaintiff of a fair trial and resulted in a wrongful conviction and prolonged incarceration.

7.4.    Defendants' suppression of this evidence was intentional, malicious, or undertaken with deliberate indifference to Plaintiff's constitutional rights. Their misconduct was the proximate cause of Plaintiff's wrongful conviction, 27 years of incarceration, and the severe emotional, psychological, and physical harm he endured.

7.5.    Defendant City of Sunnyside is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because the constitutional violations described above were caused by official policies, longstanding customs, and/or the City's deliberate indifference in failing to train, supervise, and discipline its officers. These failures include, but are not limited to: inadequate training on disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963); toleration of the use of unreliable informants without accountability or documentation; systemic misuse of off-the-books cash payments to incentivize false testimony; failure to investigate and discipline officers who suppressed exculpatory evidence or fabricated facts; and the assignment of inadequately trained officers to lead homicide investigations. These policies and failures created an environment in which constitutional violations were not only foreseeable, but inevitable. The injuries suffered by Plaintiff were the direct and proximate result of the City's

COMPLAINT FOR DAMAGES

Page 19 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

unconstitutional practices and deliberate indifference.

7.6.    This claim is timely under applicable federal and state law. For claims brought under 42 U.S.C. § 1983, accrual is governed by federal law, and pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), and *McDonough v. Smith*, 588 U.S. 109 (2019), claims that necessarily imply the invalidity of a conviction do not accrue until the conviction is invalidated. Plaintiff's conviction was vacated and charges dismissed on August 17, 2023. Accordingly, the statute of limitations on all federal constitutional claims did not begin to run until that date.

7.7.    The misconduct described herein was objectively unreasonable and undertaken with willfulness and reckless indifference to the rights of others for which an award of punitive damages is warranted.

## VIII.    FOURTH CAUSE OF ACTION: 42 U.S.C. § 1985(2) AND/OR (3) — CONSPIRACY TO VIOLATE CIVIL RIGHTS (INDIVIDUAL DEFENDANTS)

8.1.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

8.2.    Defendants, acting under color of law, conspired — expressly or tacitly — among themselves and with others to deprive Plaintiff of his constitutional rights, including the right to due process of law, the right to be free from unlawful seizure, and the right to a fair trial.

8.3.    This conspiracy included coordinated efforts to fabricate evidence, coerce or manipulate witness testimony, suppress exculpatory and impeachment material, and falsely prosecute Plaintiff for a crime he did not commit.

8.4.    In furtherance of this conspiracy, Defendants engaged in overt acts including but not limited to: (a) falsifying police reports and witness statements; (b) concealing inducements to a professional informant; (c) failing to disclose impeachment material and witness misconduct; and (d) reinforcing false narratives to the court and Plaintiff's counsel.

8.5.    The purpose and effect of this conspiracy was to unlawfully convict Plaintiff and insulate the misconduct from scrutiny. As a direct and proximate result, Plaintiff was deprived of

his constitutional rights, wrongfully convicted, and imprisoned for over 27 years, causing severe emotional, psychological and physical harm.

8.6.    Defendant City of Sunnyside is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because the constitutional violations described above were caused by official policies, longstanding customs, and/or the City's deliberate indifference in failing to train, supervise, and discipline its officers. These failures include, but are not limited to: inadequate training on disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963); toleration of the use of unreliable informants without accountability or documentation; systemic misuse of off-the-books cash payments to incentivize false testimony; failure to investigate and discipline officers who suppressed exculpatory evidence or fabricated facts; and the assignment of inadequately trained officers to lead homicide investigations. These policies and failures created an environment in which constitutional violations were not only foreseeable, but inevitable. The injuries suffered by Plaintiff were the direct and proximate result of the City's unconstitutional practices and deliberate indifference.

8.7.    This claim is timely.  Under *Gibson v. United States*, 781 F.2d 1334 (9th Cir. 1986), the statute of limitations for a § 1985 civil conspiracy does not accrue until the last overt act in furtherance of the conspiracy is completed.  The conspiracy in this case continued through at least August 16, 2023, when a key co-conspirator — under oath — falsely reaffirmed that a cooperating informant had never been paid, thereby perpetuating the cover-up. Accordingly, this claim is timely filed within the applicable limitations period.

8.8.    The misconduct described herein was objectively unreasonable and undertaken with willfulness and reckless indifference to the rights of others for which an award of punitive damages is warranted.

## IX.    FIFTH CAUSE OF ACTION: MALICIOUS PROSECUTION (INDIVIDUAL DEFENDANTS AND THE CITY OF SUNNYSIDE)

9.1.    Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

9.2.    Defendants, acting individually and within the scope of their employment, caused the arrest, prosecution, and continued criminal proceedings against Plaintiff without probable cause and in the absence of justification.

9.3.    Defendants acted with actual malice — motivated by a desire to conceal investigative misconduct, protect themselves from liability, and secure a conviction regardless of Plaintiff's innocence.

9.4.    There was no probable cause to believe Plaintiff committed the Arreola homicide.

9.5.    Defendants withheld exculpatory and impeachment evidence, fabricated witness statements, and intentionally misled the prosecution, the court, and the jury to perpetuate a false narrative of guilt.  But for this misconduct, there would have been no probable cause to initiate or continue the criminal proceeding.

9.6.    The criminal proceedings terminated in Plaintiff's favor when his conviction was vacated and all charges were dismissed with prejudice on August 17, 2023.

9.7.    Defendants conduct constitutes malicious prosecution.  See *Clark v. Baines*, 150 Wn.2d 905, 912 (2004); RCW 4.24.350.

9.8.    As a direct and proximate result of the malicious prosecution, Plaintiff suffered substantial damages, including wrongful imprisonment, loss of liberty, physical harm, emotional pain and suffering, reputational harm, and lost opportunities.

9.9.    Defendant City of Sunnyside is vicariously liable for the tortious conduct of its officers under the doctrine of respondeat superior.

9.10.    This claim is timely filed under Washington's two-year statute of limitations for torts, RCW 4.16.080(2), because it did not accrue until Plaintiff's conviction was vacated on August 17, 2023. Accordingly, this cause of action is timely brought within the applicable limitations period.

///

///

///

COMPLAINT FOR DAMAGES

Page 22 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

## X.    SIXTH CAUSE OF ACTION: ABUSE OF PROCESS (INDIVIDUAL DEFENDANTS AND THE CITY OF SUNNYSIDE)

10.1.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

10.2.    Defendants willfully and improperly used legal process — including arrest, charging, prosecution, and trial — not for its intended lawful purpose, but to achieve an ulterior objective: to secure a conviction regardless of Plaintiff's innocence, protect themselves and their department from scrutiny, and conceal investigative misconduct.

10.3.    The use of legal process was not driven by a legitimate effort to adjudicate criminal wrongdoing, but rather by a calculated scheme to manufacture guilt through false evidence, coerced witness statements, and the suppression of exculpatory information.

10.4.    This misconduct constitutes abuse of process under Washington law, which prohibits the use of legal proceedings to accomplish a purpose for which they were not designed.

10.5.    As a direct and proximate result, Plaintiff suffered wrongful conviction, incarceration, and ongoing physical, emotional, and reputational harm.

10.6.    Defendant City of Sunnyside is liable for the tortious conduct of its officers under the doctrine of respondeat superior because the acts complained of were committed within the scope of employment.

10.7.    This claim is timely filed under Washington's two-year statute of limitations for torts, RCW 4.16.080(2), because it did not accrue until Plaintiff's conviction was vacated on August 17, 2023. Accordingly, this cause of action is timely brought within the applicable limitations period.

## XI.    SEVENTH CAUSE OF ACTION: CIVIL CONSPIRACY (INDIVIDUAL DEFENDANTS)

11.1.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

11.2.    Defendants knowingly entered into an agreement or understanding — express or

COMPLAINT FOR DAMAGES

Page 23 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

implied — to achieve an unlawful objective: the wrongful arrest, prosecution, and conviction of Plaintiff. This objective was pursued through unlawful means, including but not limited to the fabrication of evidence, coercion or manipulation of witness testimony, suppression of exculpatory material, and concealment of official misconduct.

11.3.    In furtherance of this conspiracy, Defendants engaged in multiple overt acts, including falsifying reports, presenting perjured testimony, concealing material witness inducements, and misleading the Court and the defense.

11.4.    Defendants' coordinated conduct was not accidental or isolated but part of a deliberate and sustained effort to secure Plaintiff's conviction and protect themselves and their department from accountability.

11.5.    As a direct and proximate result of this conspiracy, Plaintiff was wrongfully convicted and incarcerated for more than 27 years, and he continues to suffer severe physical, emotional, and reputational harm.

11.6.    This claim is timely filed under Washington's two-year statute of limitations for torts, RCW 4.16.080(2), because it did not accrue until Plaintiff's conviction was vacated on August 17, 2023. Accordingly, this cause of action is timely brought within the applicable limitations period.

### XII.    EIGHTH CAUSE OF ACTION: OUTRAGE/INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (INDIVIDUAL DEFENDANTS AND THE CITY OF SUNNYSIDE)

12.1.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

12.2.    Defendants engaged in extreme and outrageous conduct that exceeded all bounds of decency tolerated in a civilized society.  This conduct included, but was not limited to:

      a)  Fabricating inculpatory evidence against Plaintiff;

      b)  Coercing or manipulating witness testimony;

      c)  Suppressing exculpatory and impeachment evidence; and

      d)  Knowingly causing Plaintiff's wrongful prosecution, conviction, and

COMPLAINT FOR DAMAGES

Page 24 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

imprisonment for over 27 years.

12.3.    Defendants acted with the intent to inflict emotional distress or, at a minimum, with reckless disregard for the near certainty that their conduct would cause Plaintiff severe emotional harm.

12.4.    As a direct and proximate result of this misconduct, Plaintiff suffered profound and ongoing emotional distress, including depression, suicidal ideation, trauma, anxiety, isolation, and the permanent psychological impact of spending his entire young adulthood incarcerated for a crime he did not commit.

12.5.    Defendant City of Sunnyside is vicariously liable under the doctrine of respondeat superior because the acts of its officers and agents occurred within the scope of their employment. This claim is timely filed under Washington's two-year statute of limitations for torts, RCW 4.16.080(2), because it did not accrue until Plaintiff's conviction was vacated on August 17, 2023. Accordingly, this cause of action is timely brought within the applicable limitations period.

## XIII.    NINTH CAUSE OF ACTION: NEGLIGENCE (AGAINST INDIVIDUAL DEFENDANTS AND THE CITY OF SUNNYSIDE)

13.1.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

13.2.    Defendants owed Plaintiff a duty to exercise reasonable care in the investigation, documentation, disclosure, and presentation of evidence in connection with a criminal prosecution, particularly one involving a juvenile facing life-altering consequences.

13.3.    Defendants breached that duty in numerous respects and by, among other things:

    a)  Failing to fairly and properly investigate the Arreola homicide;

    b)  Fabricating or falsifying witness statements;

    c)  Suppressing exculpatory and impeachment evidence;

    d)  Relying on the supposed claims of an unreliable and incentivized informant;

    e)  Failing to refer a potential criminal suspect (Ofelia Gonzalez) for prosecution or to disclose her status as the suspect of a serious offense in relation to the

COMPLAINT FOR DAMAGES

Page 25 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

Arreola homicide; and

    f)   Failing to comply with customary police procedures in sending in criminal referral information to the prosecution and/or defense counsel.

13.4.    These breaches fell below the standard of care applicable to law enforcement professionals and public employees and created a foreseeable risk of serious harm to Plaintiff, including wrongful prosecution, conviction, and incarceration.

13.5.    As a direct and proximate result of Defendants' negligence, Plaintiff suffered substantial injury, including loss of liberty, emotional trauma, and other economic and non-economic damages.

13.6.    Defendant City of Sunnyside is liable for the negligence of its employees, agents, and officers under the doctrine of respondeat superior and/or RCW 4.96.010. Defendant City of Sunnyside is also liable on account SPD's failure to adequately hire, train and supervise its law enforcement officers.

13.7.    This claim is timely under Washington law. The statute of limitations for negligence is three years under RCW 4.16.080(2), and accrual of this claim was tolled until Plaintiff's conviction was vacated on August 17, 2023.

## XIV.    TENTH CAUSE OF ACTION: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (AGAINST INDIVIDUAL DEFENDANTS AND THE CITY OF SUNNYSIDE)

14.1.    Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

14.2.    Defendants owed Plaintiff a duty of reasonable care in the investigation, prosecution, and treatment of him as a criminal suspect. That duty included the obligation to avoid conduct that would foreseeably cause severe emotional harm, particularly when dealing with a minor accused of a capital crime.

14.3.    Defendants breached that duty by engaging in conduct that was negligent, reckless, and unreasonable, including but not limited to:

    a)   Failing to fairly and properly investigate the Arreola homicide;

COMPLAINT FOR DAMAGES

Page 26 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

b)  Fabricating or falsifying witness statements;

c)  Suppressing exculpatory and impeachment evidence;

d)  Relying on the supposed claims of an unreliable and incentivized informant;

e)  Failing to refer a potential criminal suspect (Ofelia Gonzalez) for prosecution or to disclose her status as the suspect of a serious offense in relation to the Arreola homicide; and

f)  Failing to comply with customary police procedures in sending in criminal referral information to the prosecution and/or defense counsel.

14.4.    This negligent conduct directly and foreseeably caused Plaintiff to suffer profound emotional distress. Plaintiff was wrongfully convicted as a child, spent more than 27 years incarcerated, much of it in solitary confinement, and endured repeated psychological trauma including multiple suicide attempts.

14.5.    Plaintiff's emotional harm is genuine, severe, and was proximately caused by Defendants' breach of their duty of care.

14.6.    Defendant City of Sunnyside is vicariously liable for the negligence of its employees under the doctrine of respondeat superior. Defendant City of Sunnyside is also liable on account SPD's failure to adequately hire, train and supervise its law enforcement officers.

14.7.    This claim is timely under Washington law. The statute of limitations for negligence is three years under RCW 4.16.080(2), and accrual of this claim was tolled until Plaintiff's conviction was vacated in 2023. Because the wrongful conviction and its resulting emotional trauma were not legally cognizable as injuries until favorable termination occurred, this action is timely filed within the applicable limitations period.

///

///

///

///

///

COMPLAINT FOR DAMAGES

Page 27 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119

**PRAYER FOR RELIEF**

Plaintiff respectfully demands a jury trial and further prays for judgment against the defendants as follows:

1.    Economic and non-economic damages in an amount to be proven at trial;

2.    Punitive damages against the non-municipal Defendants to the extent authorized by law in amounts to be proven at trial;

3.    Plaintiff's reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 or otherwise provided by law;

4.    For statutory attorney's fees and costs as provided by law;

5.    Declaratory relief that Plaintiff's constitutional rights were violated;

6.    Post-judgment interest; and

7.    For such other and further relief as the court and/or jury deems just and equitable.

DATED this __4th__ day of ___August___, 2025.

LAW OFFICE OF LAURA SHAVER

By: _____
Laura Shaver, WSBA No. 44087
laura@laurashaverlaw.com
3120 Broadway
Everett, WA 98201
(425) 595-6130
Attorney for Plaintiff

LAW OFFICES OF RICO TESSANDORE, LLC

By: _____
Rico Jon Tessandore, WSBA No. 28346
legal@ricotessandore.com
3400 188th Street SW, Suite 201
Lynnwood, WA 98037
(425) 778-9800
Attorney for Plaintiff

ALLEN HANSEN MAYBROWN & OFFENBECHER

By: _____
Todd Maybrown, WSBA No. 18557
todd@ahmlawyers.com
600 University Street, Suite 3020
Seattle, WA 98101
(206) 447-9681
Attorney for Plaintiff

COMPLAINT FOR DAMAGES

Page 28 of 28

Law Office of Laura Shaver
3120 Broadway
Everett, WA 98201
425-492-4119